# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

2019 ND 138

State of North Dakota,                                                  Plaintiff and Appellee

v.

Dylan Benjamin Vetter,                                              Defendant and Appellant

No. 20180356

Appeal from the District Court of Cass County, East Central Judicial District, the Honorable John C. Irby, Judge.

AFFIRMED.

Opinion of the Court by Tufte, Justice.

Kara S. Olson (appeared), Assistant State's Attorney, and Nicholas Samuelson (argued), third-year law student, under the Rule on Limited Practice of Law by Law Students, Fargo, N.D., for plaintiff and appellee.

Luke T. Heck, Fargo, N.D., for defendant and appellant.

**State v. Vetter**

**No. 20180356**

**Tufte, Justice.**

[¶1]     Dylan Vetter appeals from a criminal judgment entered after his conditional guilty plea to possession of controlled substances and drug paraphernalia. Vetter argues the deputy sheriff who stopped him for speeding lacked reasonable suspicion to believe Vetter's car contained contraband and unlawfully expanded the scope of the traffic stop by inquiring whether there were any illegal items in Vetter's vehicle and by conducting a canine sniff around the car. We affirm, concluding the district court did not err in denying Vetter's motion to suppress evidence because the stop was not expanded in violation of the Fourth Amendment.

I

[¶2]     On March 1, 2018, around 11:35 p.m., Deputy Chad Thompson stopped Vetter for a speeding violation. Thompson is trained to handle a drug detection dog. His dog Zena was with him that night in his patrol vehicle. Before he approached Vetter's vehicle, but after it had come to a stop, Thompson noticed it rocking back and forth and saw two occupants moving around inside. He believed the occupants were trying to move or hide something. Thompson approached the vehicle, where he saw Vetter in the driver's seat. While talking with Vetter, Thompson saw an open alcoholic beverage can on the floor by Vetter's feet. In response to Thompson's questions, Vetter admitted he'd had a few drinks earlier. Thompson asked Vetter to come back to the patrol car, where he further questioned Vetter regarding consumption of alcohol. Vetter consented to field sobriety tests, including a preliminary breath test, none of which indicated impairment. After administering the tests, Thompson asked Vetter if there was anything illegal in his vehicle. Vetter denied having anything illegal in his vehicle.

[¶3]     Corporal Hedin arrived during this questioning. Deputy Thompson got out of his patrol car and asked Hedin to write Vetter a warning ticket. While Hedin wrote the

1

warning ticket, Thompson and K-9 Zena conducted a canine sniff of Vetter's vehicle. Zena alerted on the passenger side door. The vehicle was then searched, and controlled substances and drug paraphernalia were discovered. Vetter filed a motion to suppress the evidence resulting from the search. The district court denied the motion to suppress, after which Vetter entered a conditional guilty plea to possession of controlled substances and drug paraphernalia.

[¶4]    Because the issue before us turns on whether the stop was expanded in time or in scope, we include immediately below a detailed time line of relevant events during the stop as it appears in the video recording of the stop presented to the district court. All times are in the eleven o'clock p.m. hour.

35:23   Deputy Thompson activates his flashing lights to initiate a stop of Vetter's vehicle.

36:45   Thompson introduces himself to Vetter, explains speeding was the reason for the stop, and asks for registration and insurance.

37:33   Vetter hands Thompson papers.

37:33   Thompson looks at the papers and looks into the car.

37:44   Thompson inquires if Vetter has any open alcohol in the car and says he sees Vetter is trying to hide a Twisted Tea can with his foot. Vetter says he was fishing earlier and hands the can to Thompson. Thompson asks for the registration card again. Vetter hands it to him.

38:35   Thompson asks Vetter to come back to the squad car. While Vetter is walking back to the squad car, Thompson asks if he has any weapons on him. Vetter says he does not. Thompson tells Vetter to put out his cigarette and sit in the front seat.

39:03   Vetter and Thompson enter the squad car. Once in the car, Thompson shows Vetter the "locked speed." He asks how much Vetter drank that night, when was the last drink, and if Vetter feels fine to drive. Vetter responds he is fine and mentions he was in Napoleon visiting his dad.

40:41   Thompson inquires into the condition of Vetter's eyes, asks to see them, and conducts a Horizontal Gaze Nystagmus test.

42:17   Vetter initiates conversation about the weather. They lapse into silence at 42:38.

43:45   Vetter initiates conversation about fishing.

44:16   Thompson asks Vetter if he is familiar with the alphabet and counting backwards from 100 to 1. Vetter indicates that he is. Thompson has Vetter recite the alphabet from the letter C to the

2

letter T. Vetter recites the alphabet as instructed. Thompson then asks Vetter to count backwards from 75 to 58. Vetter does so.

45:42  Thompson tells Vetter that he wants to administer a preliminary breath test. Thompson reads the implied consent advisory. Vetter consents to the test. Thompson administers the test. During this exchange, at 46:43, the video shows the picture becoming illuminated from behind the patrol car.

46:57  Thompson: "Sir when you guys came to a stop I could see the whole car like rocking. Were you guys hiding anything or anything like that in there?"
Vetter: "No. I need new shocks on it."
Thompson: "You were already stopped for a bit at this point though. Nothing illegal in the car or anything like that?"
Vetter: "No."

47:13  Thompson: "Okay."

47:15  Audible throat clearing, but no further conversation.

47:25  Sound of car door shutting.

47:26  Dialog between Thompson and Hedin takes place outside car.
Thompson: "You just want to hop in my driver seat there and start writing him a warning for 75 in a 65?"
Hedin: "Okay."
Thompson: "When he stopped, his whole car was shaking, I think they were probably hiding something so . . . "
Hedin: "How many people are in there?"
Thompson: "Just him and one passenger. The driver's in my front seat. He's not, he blew zeros but drank earlier."
Hedin: "Warning for what?"
Thompson: "75 in a 65 at about 40th street."
Hedin: "40th street?"
Thompson: "Yeah."

47:57  Hedin enters Thompson's car. Dialog between Hedin and Vetter is indistinguishable.

48:06  Thompson opens rear car door to get K-9 Zena out of the vehicle. Thompson and K-9 Zena circle Vetter's car twice.

49:05  Thompson begins a third pass around the car.

49:13  K-9 Zena alerts on passenger side door.

Vetter argues the scope of the stop was expanded at 11:46:57 when Officer Thompson inquired whether Vetter and his passenger were hiding anything or whether there were illegal items in the car, because it was not within the purpose of the traffic stop. He also argues the length of the stop extended past the time required to issue him a speeding ticket. He does not argue that the expansion of the initial stop for speeding

3

to complete the DUI investigation lacked a constitutionally sufficient basis. Vetter claims there was no reasonable suspicion to expand a traffic stop for speeding into an investigation of controlled substances, including questions about illegal items and conducting a dog sniff during the stop.

## II

[¶5]   Under our standard of review,

> [t]he trial court's disposition of a motion to suppress will not be reversed if, after conflicts in the testimony are resolved in favor of affirmance, there is sufficient competent evidence fairly capable of supporting the trial court's findings, and the decision is not contrary to the manifest weight of the evidence. [This standard] recognizes the importance of the trial court's opportunity to observe the witnesses and assess their credibility, and we "accord great deference to its decision in suppression matters."

*State v. Montgomery*, 2018 ND 20, ¶ 4, 905 N.W.2d 754 (quoting *State v. Bjornson*, 531 N.W.2d 315, 317 (N.D. 1995)). "Whether findings of fact meet a legal standard is a question of law. While we do not conduct a de novo review of the findings of fact, questions of law are fully reviewable." *Id*. "Whether the facts support a finding of reasonable articulable suspicion is a question of law, and thus, is fully reviewable by this Court." *State v. Adan*, 2016 ND 215, ¶ 9, 886 N.W.2d 841 (citing *State v. Fields*, 2003 ND 81, ¶ 6, 662 N.W.2d 242).

[¶6]   "Traffic violations justify a stop by police officers." *State v. Deviley*, 2011 ND 182, ¶ 9, 803 N.W.2d 561. When an officer seizes an individual for a traffic violation, it "justifies a police investigation of that violation." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015); *United States v. Fuehrer*, 844 F.3d 767, 772 (8th Cir. 2016) ("If a defendant is detained incident to a traffic stop, the officer does not need reasonable suspicion to continue the detention until the purpose of the traffic stop has been completed."). Because a routine traffic stop is relatively brief, it is more like a "*Terry* stop" than an arrest. *Rodriguez*, at 1614. The time it takes to complete the "mission" of the stop, to "address the traffic violation that warranted the stop and attend to related safety concerns," is a permissible length of time to detain someone.

4

*Id*. (internal citations omitted). However, a stop may not extend longer than the amount of time necessary to effectuate the purpose of the traffic stop. *Id*.; *see also State v. Phelps*, 2017 ND 141, ¶ 10, 896 N.W.2d 245 (stating officer must conduct duties of stop within a "reasonable period of detention"). An officer's seizure of a person is permitted only until the "tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez,* at 1614. A traffic stop prolonged beyond the "time reasonably required to complete the stop's mission" is unlawful. *Id*. at 1616. Unrelated inquiries are permitted during a stop as long as they do not prolong the stop and extend the time the individual is detained. *Id*. at 1615; *see also Arizona v. Johnson*, 555 U.S. 323, 333 (2009). A stop may be prolonged only if the officer has reasonable suspicion to justify detaining the individual for inquiries unrelated to the stop. *Rodriguez,* at 1615.

[¶7]     During a lawfully-initiated traffic stop and continuing through the completion of the officer's duties pertaining to the mission of the stop, the "traffic violator is subject to the . . . officer's authority and restraint until the officer completes issuance of the traffic citation and expressly releases the violator." *State v. Mertz*, 362 N.W.2d 410, 412 (N.D. 1985). We have recognized that a traffic stop may include activities related to traffic enforcement but not absolutely necessary to issuing a traffic ticket. *Phelps*, 2017 ND 141, ¶ 10, 896 N.W.2d 245; *see Rodriguez*, 135 S. Ct. at 1615. In addition to issuing a traffic ticket, the duties can include:

> [R]equesting the driver's license and registration, requesting that the driver step out of the vehicle, requesting that the driver wait in the patrol car, conducting computer inquiries to determine the validity of the license and registration, conducting computer searches to investigate the driver's criminal history and to determine if the driver has outstanding warrants, and making inquiries as to the motorist's destination and purpose.

*Phelps*, at ¶ 10. An officer may also ask the "passenger similar questions to confirm the information the driver provided." *State v. Asbach*, 2015 ND 280, ¶ 11, 871 N.W.2d 820. Such activities as these "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly."

*Rodriguez,* at 1615. The traffic stop may continue "as long as reasonably necessary to conduct these activities." *State v. Fields*, 2003 ND 81, ¶ 8, 662 N.W.2d 242; *see also Rodriguez*, at 1616.

[¶8]    Our cases have held that *after* the completion of the traffic stop duties, if the officer continues the seizure, he violates the Fourth Amendment "unless the officer has a reasonable suspicion for believing that criminal activity is afoot." *Fields*, 2003 ND 81, ¶ 10, 662 N.W.2d 242; *see also Asbach*, 2015 ND 280, ¶ 12, 871 N.W.2d 820. Reasonable suspicion of an unrelated offense can arise during a lawful traffic stop. *Asbach*, at ¶ 12.

[¶9]    To determine whether an officer has a reasonable suspicion, an objective standard is applied:

> [T]his Court looks at the totality of the circumstances, applies an objective standard, and takes into account the inferences and deductions that an investigating officer would make that may elude a layperson. The question is whether a reasonable person in the officer's position would be justified by some objective manifestation to suspect the defendant was, or was about to be, engaged in unlawful activity.

*State v. Adan*, 2016 ND 215, ¶ 12, 886 N.W.2d 841 (internal citations and quotation marks omitted). This Court has "recognized that [although] the concept of reasonable suspicion is not readily reduced to a neat set of legal rules, it does require more than a 'mere hunch.'" *Fields*, 2003 ND 81, ¶ 13, 662 N.W.2d 242. However an "officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Johnson*, 555 U.S. at 333.

[¶10]   A dog sniff is not a search implicating an individual's Fourth Amendment rights. *Illinois v. Caballes*, 543 U.S. 405, 410 (2005); *State v. Gefroh*, 2011 ND 153, ¶ 9, 801 N.W.2d 429. As long as "a traffic stop is not extended in order for officers to conduct a dog sniff, the dog sniff is lawful." *United States v. Fuehrer*, 844 F.3d 767, 773 (8th Cir. 2016). If a dog sniff was conducted while the purposes of the traffic stop were still being performed and the traffic stop was not prolonged or delayed,

there is no need to consider whether reasonable suspicion was present to support extending the stop. *Id*. at 772. If the purpose of the stop was completed, or there was an unreasonable delay prior to completion, then reasonable suspicion would be required to justify the seizure.

III

[¶11] Vetter argues Officer Thompson's inquiry regarding illegal contents in the car was beyond the scope of the traffic stop, detouring into investigation of unrelated crimes, and thus necessarily delayed the stop, allowing for the canine search to be completed before the warning ticket was finished. Vetter's argument requires us to determine whether an officer may use *any* time during a traffic stop to inquire about matters beyond those approved in *Phelps*. Vetter does not contest either the initial basis for the stop here or the extension of that initial stop to investigate possible driving under the influence. Here, Deputy Thompson noticed Vetter's vehicle shaking, and testified he thought Vetter was nervous because he was chatty. When he ran a check on Vetter's license, Deputy Thompson learned that Vetter's criminal history included charges relating to controlled substances. The district court did not find there was reasonable articulable suspicion to believe Vetter had contraband in his vehicle, thereby justifying extending the stop for a dog sniff. The court concluded, and the State argues on appeal, there was no expansion of the stop that implicates Vetter's Fourth Amendment rights.

[¶12] After a stop has been completed, any further detention to conduct further investigation, such as a canine sniff, is a seizure requiring its own constitutional basis. *See Rodriguez*, 135 S. Ct. at 1609 (holding Fourth Amendment was violated where the officer returned all documents and gave the driver a written warning and then detained the driver until a dog arrived and a canine sniff was conducted); *United States v. Beck*, 140 F.3d 1129, 1139-40 (8th Cir. 1998) (reversing denial of motion to suppress where officer told driver he was free to go, began walking away, returned to inquire if there were any guns, drugs, or knives in the vehicle, and then required the driver to wait for a canine unit to conduct a drug sniff); *Adan*, 2016 ND 215, ¶ 11, 886

7

N.W.2d 841 (affirming extension of traffic stop after concluding district court correctly found reasonable suspicion under the circumstances); *Deviley*, 2011 ND 182, ¶¶ 15-16, 803 N.W.2d 561 (affirming denial of motion to suppress where officer extended stop to await arrival of canine unit, because the extension was supported by reasonable suspicion); *Fields*, 2003 ND 81, ¶¶ 4, 21, 662 N.W.2d 242 (affirming suppression of evidence obtained after the officer issued a citation for expired tags, said goodbye, turned and started walking away, came back and asked if the driver had any drugs in the vehicle, and then made the driver wait for a drug detection dog). In each of these cases, the stop was prolonged after it otherwise would have been completed. Here, Vetter argues the impermissible delay occurred in the middle of the traffic stop. K-9 Zena alerted to the contraband while Corporal Hedin was still writing the ticket.

[¶13]   If there are two officers present and one is performing the mission of the traffic stop while the other contemporaneously conducts a dog sniff, there is no violation because there is no delay or extension of the stop. *Phelps*, 2017 ND 141, ¶ 1, 896 N.W.2d 245; *see also Fuehrer*, 844 F.3d at 770-71, 773. In *Phelps*, the first officer pulled Phelps over because his boat trailer did not have a license plate. *Phelps*, at ¶ 2. The officer received Phelps' driver's license and registration and was returning to his vehicle to run the information when Sergeant Sass arrived with a canine unit. *Id*. After running the information, the first officer got out of his vehicle, Phelps got out of his vehicle, and the two of them (the first officer and Phelps) met behind the boat trailer and spoke. *Id*. While they were talking, Sergeant Sass directed his canine around Phelps' vehicle, and the canine indicated the presence of drugs. *Id*. We held Phelps was not detained beyond the time reasonably necessary. *Id*. at ¶ 13. Vetter's situation differs somewhat from the facts in *Phelps* because here the officer who initiated the traffic stop, Thompson, took a brief period of time to hand off to Hedin the ticket-writing task so that Thompson would be free to conduct the dog sniff. In *Phelps*, there was no hand-off and thus no delay in the ticket-writing process. The time taken by one officer to hand off traffic stop duties such as completing the ticket to another

officer is within the mission of the stop. The time taken by Thompson to instruct Hedin on what ticket to write was reasonable and did not prolong the stop contrary to the Fourth Amendment.

[¶14] In *Rodriguez*, the arresting officer waiting for a drug detection dog to arrive after the stop was complete was the action that prolonged the traffic stop. 135 S. Ct. at 1613. Here, the questioning about the illegal contents and the handing off of the ticket writing during the stop is what allegedly prolonged the stop. In *Rodriguez*, the delay for the drug dog was a detour from the mission and thus prolonged the seizure after the stop was completed. *Id*. at 1613, 1616. The "reasonableness of a seizure . . . depends on what the police in fact do"; the "critical question, then, is not whether the [act] occurs before or after the officer issues a ticket . . . but whether conducting the [act] 'prolongs'—i.e., adds time to—'the stop.'" *Rodriguez* at 1616.

[¶15] Deputy Thompson testified Corporal Hedin arrived on the scene as Thompson was administering the breath test. In the squad car video, headlights can be seen arriving at the scene at 11:46:43. This is just before Thompson questioned Vetter about illegal contents. Thompson finished administering the breath test and asked about illegal contents at 11:46:57. The exchange between Thompson and Vetter regarding whether Vetter's car contained illegal contents took 16 seconds. The exchange between Deputy Thompson and Corporal Hedin regarding the instructions for writing the ticket took 31 seconds. In total, the time spent by Deputy Thompson asking the questions allegedly outside the scope of the stop and handing off the ticket writing was one minute. This did not unreasonably prolong the stop, especially because the ticket was still being written when the dog alerted to the presence of contraband.

[¶16] We acknowledge that *Rodriguez* rejected a *de minimus* time exception for extending a traffic stop beyond its completion. Under the reasoning in *Rodriguez*, detaining a driver even 16 seconds after giving the driver a ticket and completing the traffic stop requires a constitutionally sufficient basis to seize the driver. It is one thing to conclude the Fourth Amendment prohibits such a detention after a stop is

9

complete. It is quite another to scrutinize a traffic stop looking for 16 seconds that were not strictly necessary for the officer to complete the traffic stop. Absent evidence of an officer deliberately delaying a stop so that, for example, a drug-detecting dog may arrive, *Fields*, 2003 ND 81, ¶ 21, 662 N.W.2d 242, such minor inefficiencies in traffic stops are unlikely to establish a Fourth Amendment violation.

[¶17] The questions regarding illegal contents at issue here may constitute investigating other crimes, about which we have said "[o]n-scene investigation into other crimes detours from the purpose of the stop," *Asbach*, 2015 ND 280, ¶ 12, 871 N.W.2d 820 (citing *Rodriguez*, 135 S. Ct. at 1616), but we have made allowances for other conversation not absolutely necessary to the stop. Vetter's argument would require us to examine an officer's actions step-by-step throughout the traffic stop for utmost efficiency. Such strict efficiency is not required by the Constitution. Although "[i]f an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete the stop's mission,'" *Rodriguez*, at 1616, we "are not persuaded that it is necessary to parse every citizen-officer interaction for indications of efficiency of purpose." *Curry v. Indiana*, 90 N.E.3d 677, 686 (Ind. Ct. App. 2017). There is no reason an officer needs to use a stop watch or avoid incidental conversation about fishing or the weather to reasonably accomplish the mission of the stop.

[¶18] We conclude there is no Fourth Amendment violation established by the questioning of Vetter in the manner that occurred here. The Fourth Amendment does not call us to scrutinize traffic stops for unnecessary casual conversation or impose a constitutional mandate for time efficiency over incidental questions or conversation. The hallmark of a Fourth Amendment claim is whether the search or seizure was "reasonable." *State v. Helm*, 2017 ND 207, ¶ 6, 901 N.W.2d 57. There is no objective indication here that any question or conversation was a delaying tactic to extend the seizure so that officers could continue an investigation. The canine was already present at the beginning of the stop. On this record, the 16 seconds the officer spent asking about whether the shaking of the car was due to concealment of contraband

10

and the short time spent handing off the ticket writing did not extend the time of the stop such that Vetter would have been free to go before the dog alerted to his car.

IV

[¶19]   We affirm the district court's order and judgment denying Vetter's motion to suppress the evidence resulting from the dog sniff, because the traffic stop was not extended under the prevailing case law.

[¶20]   Jerod E. Tufte
Daniel J. Crothers
Lisa Fair McEvers
Jon J. Jensen
Gerald W. VandeWalle, C.J.